In the matter of the probate of the will of EDOUWARD W.
METHOT.

[Decided September 20th, 1916.]

1. Prejudice and partiality are not grounds for setting aside a will.

2. The evidence in this case is not sufficient to set aside the will of
this testator on the ground of undue influence.

3. The term "interdiction" as used in French-Canadian law means a
proceeding to obtain a curator of person and property, and includes the
calling of a family council and proceedings in court, including a hearing.

On appeal.

*Mr. Ralph E. Lum* and *Mr. Frankenberg* (of the New York
bar), for the appellants.

*Mr. Edmund Wilson* and *Mr. Gilbert Collins,* for the re-
spondents.

STEVENS, VICE-ORDINARY.

This is an appeal from the decree of the orphans court ad-
mitting the will of Edouward Wenceslas Methot to probate.

The testator was a French Canadian, born in the Parish of
St. Croix, in the Province of Quebec, October 13th, 1839. He
committed suicide in Red Bank, in this state, in June, 1914, at
the age of seventy-six. After accumulating a considerable for-
tune as a lumberman, he gave up his business and went to the
city of Quebec to live. He purchased shares of a Quebec bank
called La Caisse d'Economie, and in 1886 was elected a director.
In 1892 he became its president and remained so until 1907.
Under his presidency the bank grew into a strong and flourish-
ing institution. He is described by his colleague, Mr. Marcoux,
as being at this period a very shrewd business man—a man of
great force of character and an excellent manager and financier.
In 1906 the directors wished to put into the directorate the
cashier of a rival bank. This Mr. Methot thought inexpedient
and he opposed it with all the energy he could command, but did

not prevail. He declined longer to serve, and, as his whole life seems to have been wrapped up in this work, and as he had no other employment or interest, his retirement had an extraordinary effect upon him. He became greatly depressed. On the advice of his physician he took a trip to the United States, which did him no good, and in the late summer or early fall of 1907, his depression degenerated into melancholia. He was placed under restraint, first in his own house for nearly a year and then in the Asile St. Benoit, an institution conducted by the Brothers of Charity of the Quartier Longue Point, in Montreal. In May, 1910, he was released from that institution as completely cured. Then, in accordance with medical advice and his own inclinations, he resolved not to return to Quebec. He went abroad for the summer in company with Doctor Winfrey and Doctor Winfrey's wife, at whose house he had been staying after he left the hospital. He returned in the fall, going first to a New York hotel and then paying a visit to his favorite nephew, Homer Methot, who lived at Red Bank. He was so much pleased with this place that he bought a house there and continued to live there up to the time of his death. He made the will, which is the subject of the present controversy, September 16th, 1911—that is, nearly three years before his death. By this will he left such of his property as was not included in a deed of trust—property worth, it is said, about $60,000, to his nephew Homer. He had never married.

The will is contested, first, on the ground that he was insane when he made it, and secondly, on the ground that it was the product of undue influence exerted by Homer. The other grounds stated in the petition of appeal are plainly untenable.

It is so clear that the testator was of sound and disposing mind when he made his will that it would be a mere waste of time to review the evidence. The witnesses for the appellants themselves virtually concede it. The only arguable question is whether he was unduly influenced.

The argument, as I understand it, is this: Homer Methot sought, with success, to instill into his uncle's mind a prejudice against his Canadian cousins by suggesting that it was they who were responsible for putting him needlessly under legal restraint

in the first instance, and that it was they, or some of them, who were also responsible for keeping him in the Asile St. Benoit after he had recovered his sanity; their motive being to prevent him from changing or revoking a will which he had made in 1907 in favor of all his nephews and nieces.

This insistment requires a somewhat extended review of the evidence. It may be proper to state at the outset that the controversy does not touch the greater part of Methot's estate. He disposed of that by a trust deed executed at the time he executed his last will. Speaking, generally, this trust deed gave certain small sums of money to certain annuitants and others. It reserved the balance of the income, amounting to about $24,000 per annum, to himself. It provided that, on his death, Emeline Methot Fleming, his niece, a sister of Homer, should be paid the income arising from the investment of $100,000, which, on her death, was to go to her children; that Louis Ebens Methot, a brother of Homer, should be paid the income of $100,000 for life; the principal, after his death, he being childless, to go to Homer; and that Homer should have the residue. The property thus conveyed is estimated, in the evidence, to be worth half a million, and the conveyance was subject to a power of revocation. This deed, for some reason or other, has not been attacked. It cannot be overlooked, as it is so closely bound up with the will and with testator's actions.

I have said, that in the winter and spring of 1907, Methot became greatly depressed because of the action of his co-directors. While under the influence of this feeling he made the will of 1907, distributing his property (not, however, equally) among his nephews and nieces, of whom he had about fifteen. He had previously, in 1898, made a will in which he had given these same nephews and nieces $10,000 a piece, and the residue of his estate to his nephews and niece, Homer, Ebens and Emeline, the same persons who took the bulk of his estate under the trust deed of 1911. His motive, in 1907, for changing the residuary disposition he had made in 1898 does not appear, but it is certain that he had no sooner made the will of 1907 than he became dissatisfied with it. This appears, not only from the testimony of a number of witnesses called for the respondent,

*87 N. J. Eq.*          In re Methot's Will.          •

but by the evidence of Mr. Marcoux, one of the principal witnesses of the appellant—the curator of his property and his intimate friend and business associate. That he did not then alter it is undoubtedly due to the fact that he so soon thereafter became afflicted with melancholia.

The nephews and nieces consisted of the Arcands, of whom there were five, and among them Adolph, who, with Mr. Marcoux, became curators; of the Thibeaudeaus, and of the Methots, of whom there were five, viz., Homer, Ebens, Ernest, Emeline and Eugenie. There were also some grandnephews and nieces, children of deceased nephews and nieces. Of all these Homer was, undoubtedly, testator's favorite. In point of age, they were seventeen years apart. Homer had been since childhood his companion on his hunting and boating excursions. He was accustomed two or three times every year to visit him at his home, first in Boston, then in Yonkers, and then in Red Bank. He admired him because of his business ability and success. On the other hand, he seems to have cared little for his other relatives—if we except Homer's brother and sister and his niece Josephine Arcand.

It appears that in the latter part of September, or the early part of October, 1907, his mental condition became such as to require action. The appropriate proceeding was, under French Canadian law, "interdiction;" a proceeding instituted for the purpose of obtaining a curator of the person and property. It included the calling of a family council and a petition to the court or its prothonotary, followed by a hearing. The petition to the prothonotary, in the present instance, dated October 8th, 1907, contains the following:

"2nd. That for one week or more the said Methot has been struck and is habitually suffering of insanity and dementia, the illness of which he suffers being a monomania, which continually holds him in a state of insane and violent fear of being despoiled of his property, keeps him from spending the necessary amount to take care of his person and of his fortune, which is very large, and even inclines him to suicide, which he tried to commit last Sunday."

On this petition the deputy prothonotary made an order, reciting the holding of a family council, at which, among others,

Homer and Ebens Methot and Adolph Arcand were named as being present and consenting; and reciting, further, the examination of Methot himself, and ordering that joint curators be appointed. Under this appointment Adolph Arcand took care of his person and L. Cyrille Marcoux took care of his property.

There can be no doubt whatever that this action was proper, and that it was taken with the consent and approval of the friends and relatives who composed the council. I think the weight of the evidence is, that Mr. Methot, himself, when he was restored to reason, did not disapprove of it and did not harbor any feeling of resentment against anyone for having taken part in it. What he did resent was his treatment by Adolph and by the physicians employed by him.

From October, 1907, to September, 1908, he was confined to his own house. Adolph gave up his work in Montreal and came to live with him, the decree giving him a salary of $125 per month. He engaged two men—the brothers Guillemette—who were to watch him and restrain him during his periods of violence. There has been no criticism of the treatment for the eleven months that he was so confined, except in reference to the strap used. In his crises, as they are called, he was firmly bound—sometimes to his bed. All the doctors agree that the practice was unnecessary and ought not to have been resorted to. Doctor Shirres, a prominent Canadian neurologist, testifies that the restraint was unwise. He says:

"I have been the head of the Hospital at Verdun (Canada) where we have over eight or nine hundred patients and where the violence is very extreme and the restriction by means of a belt or straightjacket is a thing that is hardly ever known. Now it is only known among the very roughest class of patients, and where the violence is very extreme; and if it is possible, we usually place that man in an isolated hall or room, and give him a chance so that he can walk it off and try it out, and if that fails, we may have to use restraint, but it is a thing that is very seldom used. I do not suppose it is used in our hospital three times a year."

Doctor Wilson, a New York neurologist, says that the propriety of using a strap

"depends upon the type of the insanity and the financial ability of the patient. * * * If you have a person who tends to be violent, in a

small room, putting him in a very large room, ample room or suite of rooms, they will have none of them at all, for they suffer from the feeling—from a delusion of theirs—that the walls are coming on them. * * * If a person who tends to be violent is allowed sufficient space to work off his primary excitement in motor activity they very often will quiet perfectly. * * * There are many devices and many methods that. if the person has the financial ability, can be applied and render physical restraint unnecessary either by apparatus or by people."

Doctor Turcot had been the attending physician of. Methot for many years, but some months before he became insane, Methot had been consulting Doctor La Rue, and the curator continued to employ this latter gentleman from October, 1907, to March, 1908, when, becoming dissatisfied, he dismissed him and went back to Doctor Turcot. Now, both Doctor Turcot and Doctor La Rue disavow all responsibility for the use of the strap. They say they did not direct it or know of it. Doctor Shirres says that Doctor Turcot told him afterwards that he was firmly of the belief that the use of that restraint in earlier days was, undoubtedly, a big factor in Methot's mental break-up. Adolph, the curator, says the strap was used to the knowledge of Doctor La Rue, and that its use, for a while, continued after Doctor Turcot took charge. In this he is corroborated to some extent by the two attendants. On the other hand, Jeanne D'Agneau, the housekeeper, says that the strap was procured by Adolph at the suggestion of the man who tended the furnace, after a spell of unusual violence. Adolph, himself, admits that on one or two occasions he helped to bind his uncle.

I have been thus explicit in stating the evidence as to the strap, because it may have had more or less influence in creating a prejudice against Adolph and Adolph's family. The uncontradicted evidence of Doctors Shirres and Wilson is that in cases of melancholia (but not in other forms of insanity) the patient after recovery has a clear recollection of what occurred during his illness. While the testimony fails to show that Mr. Methot evidenced any feeling of hostility to Adolph, except while he was assisting in binding him, the memory of what he had done, and, if we may believe the doctors, unnecessarily done, was not likely to increase his regard for him, and more particularly when he remembered, as he did, that Adolph, not only after January,

1908, prevented Homer and other friends from visiting him, but even from communicating with them by letter.

Doctor Turcot was, undoubtedly, opposed to harsh methods, and under his care the patient improved. In August, 1908, Homer went to Quebec and asked permission to see his uncle. The doctor refused on the ground that quiet and isolation were indispensable to a recovery. Later, in the same month, Homer went again—this time with his brother-in-law, Mr. Fleming. Again they asked permission and were refused. After the second refusal Homer says that he and Fleming watched near the house until his uncle went out driving, and that then they took a carriage and followed. At a certain point on the road his uncle saw him, left his own carriage, and with the consent of the attendant rode for a while in theirs. Homer says that his uncle, in the beginning, talked rationally, but coming toward home "was not all himself." He entreated Homer to take him home with him, but, of course, Homer refused. Doctor Turcot says that this visit made him worse, and that this, and a visit which he made to the Caisse d'Economie, "which threw him all overboard," determined him to put him in an asylum for the purpose of more complete isolation, and that after personal investigation he fixed upon the Asile St. Benoit, in Montreal, as the most suitable. Accordingly, he was taken there. The institution is thus described, and, as I think, fairly described, by Mr. Greenshields, employed by Homer as his counsel to secure Methot's release; then a prominent legal practitioner and afterwards appointed to the bench of the superior court of the province. He says:

"I think the Brothers who conduct the St. Benoit Asylum are very worthy, honorable people. But it is limited in its facilities for the treatment of patients. It is filled or at least habituated largely by inebriates of a certain class. * * * It is a small place—very small grounds around it—well maintained for its size. I fancy that the charges are very limited and that they give quite a *quid pro quo* for what they charge —not a place for the treatment of men whose social and financial condition were like Mr. Methot's."

It seems to have been the most suitable place that was available in the Province of Quebec. Doctor Shirres says that under

like conditions he always sends his patients to an institution in the United States. Methot was not sent to such an institution, possibly because of local pride or prejudice, or possibly because the curators did not want him to go out of the jurisdiction and, so be to some extent, beyond their control. If his cure alone had been the sole consideration, an intelligent and liberal-minded guardian would have taken this course. The cost did not enter into the calculation, for Methot was a bachelor with a yearly income, as I have said, of $24,000.

On his arrival at the hospital, in September, 1908, he was placed under the care of Doctor Villeneuve, a leading Montreal neurologist. He had begun to improve while under Doctor Turcot's care, and he continued to improve, and, I think, rapidly, up to May, 1909, when Father Lovett, of whom I shall now speak, regarded him as entirely sane. He had been almost completely isolated. I say almost, because, although Adolph swore on his direct examination that he allowed no relative to see or correspond with him, he was forced by the exhibition of letters, to admit on his cross, that he had on several occasions allowed him to write to and receive letters from his (the testator's) brother-in-law, Doctor Arcand, and also to write to other members of the Arcand family.

Father Lovett was an inmate of the asylum, confined there as an inebriate, and not, as the evidence would indicate, entirely dependable. His letters show him to have been a highly-educated and intelligent man, and so it is testified. He was Mr. Methot's constant companion. At Methot's request, in June, 1909, he wrote a series of letters to Homer in which he expressed the opinion that his uncle was sane and ought not longer to be confined. In his first letter he said:

"Never has the writer heard a word or a syllable from your uncle's lips that would in the least degree indicate any mental derangement. On the contrary, considering the loss of sleep and the consequent nervous prostration your uncle suffered from, the writer considers his present mental strength remarkable and extraordinary. His memory of past events could not have been more ready and retentive when he was thirty or forty years younger, and his intelligent discussion of financial affairs could not have been clearer when he was president of the Caisse d'Economie."

Two months before that Homer had received a note from Mr. Casgrain, a prominent Montreal lawyer, who afterwards represented the curators and is now a member of the Canadian Government, in which he says that as a fast friend of Methot's for quite a number of years, he writes to say that he has heard from an excellent source (that source, as I understand, being Lovett and an attendant named Cote) that his old friend is completely cured, and that he (Methot).

"thinks it is very hard that he should be obliged to remain in this place among a lot of people who are detained there either because they are confirmed drunkards or because they are suffering from some other disease which causes insanity, such as epilepsy. He seems to think that if it is necessary that he should be restrained, with the means at his disposal, he might have surroundings not only more congenial but also more conducive to the complete restoration of his health."

In his letter of May 21st, Lovett had suggested that Homer put himself in communication with the legal firm of which Mr. Greenshields was a member. On June 15th, 1909, Homer went to Montreal with his brother-in-law, Fleming, and saw him; Mr. Greenshields made arrangements for a meeting with Father Lovett and Doctor Shirres on the day following. It was thought better to make an effort to have Methot examined, rather than to resort to *habeas corpus* proceedings. Mr. Greenshields first went to the hospital and asked the superior's permission to see Mr. Methot himself, or to allow an outside doctor to see him. He was told that he would have to apply to the curator. He did so, and received a letter from Adolph in which he said:

"As to the consultation you demand, my personal opinion is that the doctors who care for Mr. Methot are honorable and competent men and can perfectly well instruct Mr. Homer Methot on the condition of his uncle."

He said further that he would not do anything without their advice, and added: "I regret much these efforts because Mr. Homer Methot knows, personally, as well as myself, that unfortunately our dear uncle is insane." Homer, in fact, did not know his uncle's condition at that time, except in so far as he was apprised of it by Lovett, and the evidence certainly raises a doubt as to whether he was *then* insane.

Mr. Greenshields succeeded at last in bringing about a meeting between Doctor Shirres and Doctor Villeneuve. Doctor Villeneuve suggested that Doctor Shirres postpone his examination for some weeks, and to this Doctor Shirres assented. On January 13th, 1910, Doctor Shirres made a thorough examination of Mr. Methot and found him, as he says, perfectly sane. For greater certainty he repeated his visits on the 20th and 26th of the same month. He was confirmed in his first opinion and he reported the result. Then, on January 27th, there was a consultation at which Doctor Villeneuve, Doctor Dechatelet, the physician in charge of the hospital, Doctor Turcot, Doctor Bourque and Doctor Shirres attended. Doctor Shirres said that he was absolutely of opinion that Methot was a sane man and fit to be at liberty. Doctor Dechatelet said he did not think him sufficiently recovered to be given his liberty at that time, but did not say that he had any delusions. None of them thought he showed any symptoms of insanity, but that, at times, he was a little bit depressed and excited. A middle course was taken. He was to be given more liberties, and if no bad results happened, these liberties were to be extended, and he, finally, released. First, he was allowed to make trolley trips to various parts of Montreal; then he was taken from the hospital and placed in charge of a young Doctor Winfrey and his wife at their home, and, finally, having stood these tests, the interdiction was, on May 18th, 1910, raised by the court which had imposed it.

Up to this time Homer had not been permitted to see him, but he was allowed to correspond with him after he had gone to Doctor Winfrey's. On May 18th, he met him for the first time in over two years.

Greenshields had advised Methot after his release to take things easy and let some Montreal trust company take charge of his property. He thought the advice good, but said he would prefer to have it managed by his nephew Homer. Accordingly, he gave Homer a full power of attorney to verify the curators' accounts and to take charge of what they handed over to him. Homer continued to manage the property until the trust deed was made in September, 1911, and thereunder he became the trustee. On May 26th, 1910, Mr. Methot went before two

notaries in Montreal and revoked the will of 1907 and revived the will of 1898.

His physicians advised him not to return to Quebec to live. In June, in company with Doctor Winfrey and his wife, he took a trip to Europe, returning in the fall. He first stayed in a hotel in New York and then made a visit to Homer at Red Bank. He was so much pleased with the place that he leased and afterwards purchased the house in which he died.

The will of 1898 gave some legacies to Quebec charities; $10,-000 a piece to fifteen nephews and nieces, or their representatives, and, with some deductions, the residue to Homer, to Homer's brother Ebens and to Homer's sister, Mrs. Fleming. The will of 1907 gave legacies to various Quebec charities; $16,-832.50 a piece to substanially the same persons to whom nine years before he had given $10,000, and the residue, with some deductions, to Homer Methot, Oscar Arcand, Alphonse Arcand, Adolph Arcand, Arthur Arcand and Josephine Arcand.

With a view to establishing undue influence or what in the appellant's argument is styled a conspiracy between Homer, Ebens and Mrs. Fleming, of which I cannot find any evidence, great stress was laid upon what occurred after the interdiction was raised.

Now, there is no direct evidence that Homer used any influence to induce his uncle to make a will in his favor. He did not live with him, and he was not consulted about its provisions. Methot, as far as I can see, was his own master. The whole argument rests on inferences.

To judge fairly of Methot's acts we must put ourselves in his place and view things from his standpoint. At the time of his release, and afterwards, what did he remember and what did he know? The evidence, as I have said, is that a melancholiac on recovery remembers what occurred during the period of his insanity. We may, therefore, reasonably conclude that he knew that he had been interdicted and that Homer on the one hand and the Arcands on the other had concurred in the proceeding. He knew, and admitted, as the evidence abundantly proves, that he had really been insane. As a man restored to reason, he must have recognized the fact that the interdiction was necessary.

and that he should entertain no grudge against those who had brought it about. It must be borne in mind that we are dealing with a highly-intelligent business man who could look at things as they were.

Then, again, we may reasonably conclude that he remembered that he had been bound and that Adolph had helped to bind him, conduct which he is said to have resented. It is probable that he knew that such treatment was antiquated, and, in his case, with his resources, unnecessary. He must, too, have remembered that when at the Asile. St. Benoit, after he had thought himself restored to reason, he had repeatedly written to different members of the Arcand family begging them to help him regain his liberty, and that they had done nothing. He may have remembered, too, that Adolph had allowed him to correspond with members of the Arcand family, and had not, after January, 1908, allowed him to see or correspond with his favorite nephew, Homer; and he may, moreover, have suspected, without harboring . any insane delusion, that the Arcand family thought it to their interest to keep him where he was, for the reason that they would get the bulk of his residuary estate if he died in confinement. I say this because Doctor Winfrey, one of appellant's witnesses, says that he so expressed himself. He told Mrs. Ritchie that the Arcands had their heritage whilst they kept him in St. Benoit, and not a cent would they get from him. He may have thought, too, and very reasonably, that afflicted with the type of insanity from which he suffered, and possessed of the financial resources that he possessed, he should have been confined in an institution more fitted to his condition, even if it were necessary to send him over the Canadian border. He knew, too, that it was Homer and Fleming who had been instrumental in procuring his release, and that in all probability, except for Homer's efforts, and the threat of legal proceedings, he would have been detained longer than he was. A few months even, for a man of seventy-three, was a considerable fraction of the time that he could hope to live.

Now, in view of all these considerations, is it surprising that on his release he should have given to Homer, whom he admired as a man of the same type with himself, viz., a successful busi-

ness man, who had long been his favorite nephew and com-
panion, and who had now become, in a way, his benefactor, the
care of his property in preference to some trust company, whose
officers, he did not know; and was it extraordinary that he
should have wished to revive a will which gave to Homer, Ebens
and Mrs. Fleming the bulk of his property, and to revoke a will
which had not been satisfactory to him from the time he made
it, and which gave much the greater part of his residuary estate
to the Arcand family. It seems to me that it is evidence of his
moderation and good sense that, at the time of his release, he
went no further than to put the Arcands in the position they
had occupied prior to 1907.

In 1911 we find him permanently domiciled in this state.
In July of that year—two months before he made his will—he
had applied for naturalization papers. He had never, as far as
the evidence discloses, cared much for any of his Canadian rela-
tives except his sister, Mrs. Arcand, who predeceased him, and
Josephine Arcand, to whom he had given stock of the Chinic
Company in 1907. He did not visit or correspond with his
Canadian cousins. Evidently, he had lost interest in them. He
had the same right to discriminate between his relations that
every testator has. Prejudice and partiality are not, under our
system of jurisprudence, grounds for setting aside a testament.
He chose to give his property to those who had been his favored
legatees as far back as 1898. When he made the will of 1911
he conducted his own household. He exercised a very careful
supervision over his affairs. He went where he pleased and did
what he pleased. The evidence fails to show that his mind or
his will were weak. He had, indeed, given to Homer, in whom
he had implicit confidence, a power of attorney to manage his
property, but it was a power that he could at any time revoke.
Homer was his agent during his pleasure. As far as I can see,
Homer had no dominating influence over him. He was not at
the time his trustee, for the trust deed was contemporaneous
with the will. In view of what had happened, it cannot be said
that his disposition cannot be accounted for except on the theory
that his prejudices were the product of an insane delusion or

that they had their origin in false or misleading suggestions made by the person to profit by them.

The idea that he was under the hypnotic influence of Doctor Shirres when he made the will of 1911 has support only in the imagination of counsel. Their argument is unusually vituperative. It questions the motives of the respondents' witnesses and asks that implicit reliance be accorded the appellants. I find no ground for the distinction.

The evidence is very voluminous, and the case is here stated only in outline, but that outline appears to be sufficient to show that the decree of the orphans court should be affirmed.